`           **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:09-CV-212-R**

PATRICIA FUQUA                                                          PLAINTIFF

V.

UNITED STATES OF AMERICA                                   DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon the parties' cross motions for summary judgment (DN 58 and DN 67). These matters have been fully briefed. Defendant has additionally filed a partial motion to dismiss (DN 84). This matter has also been fully briefed. For the following reasons, Defendant's motion to dismiss (DN 84) is GRANTED, Plaintiff's motion for summary judgment (DN 67) is MOOT in part and DENIED in part, and Defendant's motion for summary judgment (DN 58) is MOOT in part and DENIED in part.

## BACKGROUND

Plaintiff Patricia Fuqua is the owner of a 53.01 acre tract of land (the "Property") located below a new flight path into the Fort Campbell airport in Christian County, Kentucky. On December 14, 2007, the government filed an action pursuant to Federal Rule of Civil Procedure 71A, seeking to condemn certain portions of that land. *See United States v. 20.67 Acres, et al.*, No. 5:07-cv-00207. On December 21, 2007, the Court issued an order condemning the property and ordering possession of said property to be immediately surrendered, to the extent of the estate condemned as described in the Declaration of Taking filed by the government. The amount of compensation owed to Plaintiff has yet to be determined by a jury. That action is currently pending before this Court.

Plaintiff's Property is bordered to the north by Interstate 24 and is bordered to the west by a railroad track, now owned by the United States. The only access to the Property is by way of Naomi Lane off of U.S. 41A. Naomi Lane crosses over the railroad track and continues eastward into the Property. On December 14, 2007, Fuqua filed this action for a Declaration of Rights.[1] In Count IV, Fuqua seeks a declaration that the United States owns an easement for its railroad and does not own the land in fee simple. In Count V, Fuqua seeks a declaration that Naomi Lane is a public road and that there is a public crossing at the road's intersection with the government's railroad. A history of the Property, the railroad track, and Naomi Road is necessary to a determination of this action.

## I.  The Property and the Railroad

The railroad constructed on the property dates back to 1903. At that time, what is known as Stump Farm was composed of three separate tracts of land: the 423-acre R.H. Rives tract, the 100-acre E.H. Garrott tract, and the W.A. McKenzie tract (acreage unknown). Plaintiff's Property is traceable back to the Garrott tract and the Rives tract. With respect to the Rives and McKenzie tracts, the Tennessee Central Railroad Company ("Tennessee Central") filed a petition in the Christian County Court in March of 1903 "to condemn right-of-way across the land for railroad purposes . . . ." Condemnation Order, DN 71-2. The condemnation Order and Judgment, dated May 4, 1903, assessed the value of the condemned Rives land to be $1,600 and the damages to be $1,500. The Condemnation Order further ordered the defendants to execute and deliver a deed conveying the land to Tennessee Central. By deed dated April 23, 1903, R.H

---

[1] In Counts I, II, and III, Fuqua asked this Court to interpret two clauses in the United States' avigation easement. The Court subsequently dismissed these counts for a lack of subject matter jurisdiction. DN 18.

Rives, his wife, and the Fidelity Trust and Safety Vault Company granted rights to Tennessee

Central for a 15.21 acre strip of land along the railroad.[2]  The deed states, in relevant part:

> That for and in consideration of the sum of Thirty One Hundred ($3100.00)
> Dollars cash in hand, the said parties of the first part have this day bargained, sold
> and conveyed and by these presents doth bargain, sell and convey unto the said
> Tennessee Central Railroad Company, its successors and assigns forever the
> following strip of land located in Christian County, Ky., being a strip of land one
> hundred feet wide fifty feet on the left of the center line of the survey of said
> railroad . . .  containing 15.21 acres more or less . . . .  To have and to hold the
> aforesaid tract of land herein conveyed unto the said Tennessee Central Railroad
> Company, its successors and assigns forever with covenants of general warranty
> of title.

DN 58-3.  On April 21, 1903, in consideration of $700.00, E.H. Garrott and his wife granted

rights to the Tennessee Central for a 2.74 acre strip of land, being 50 feet to each side of the

centerline of the survey of the railroad.  DN 58-2.  This deed utilizes identical language as the

Rives deed.

W.A. McKenzie later acquired the Garrott tract and a portion of the Rives tract.  The

October 3, 1914 deed from Mattie Hopson, the daughter of Garrott, to McKenzie described the

Garrott tract as comprised of land on both sides of the railroad.  The conveyance excepted from

the conveyance the land "heretofore conveyed to the Tennessee Central Railroad Company for a

right-of-way . . . ."  DN 70-3.  By deed dated May 1, 1937, W.A. McKenzie conveyed the 123.33

acre Stump Farm to the United States.  On July 14, 1947, the United States returned the property

to private ownership.

Billy Stump and Margaret Stump acquired the property from Emma Trubenbach by deed

dated January 12, 1968.[3]  This deed also refers to the "right-of-way line of Tennessee Central

---

[2] The United States does not believe this deed from R.H. Rives and his wife to Tennessee Central
encompasses the property at issue–the railroad crossing.  However, this deed is identical to the
Garrott deed.

Railroad." DN 58-11 at p. 5. Martha Stump acquired the Property from Billy Stump and Margaret Stump on December 15, 1981. This deed's description of the land conveyed likewise refers to the "right-of-way line of Tennessee Central Railroad." DN 58-11 at p. 2. On August 3, 1976, Martha Stump and her husband deeded part of Stump Farm to the Commonwealth of Kentucky for the construction of I-24, which physically divided Stump Farm and blocked alternative access to the Property except for Naomi Lane.

Robert Ladd, Plaintiff's former husband, purchased the 53.01 acre property from Martha Stump on August 23, 1983. This deed refers to the railroad right-of-way. DN 58-7. This conveyance was a part of a division of the approximately 123.33 acre Stump Farm. Following her marriage to Ladd on August 23, 1998, Plaintiff resided on the property until their divorce 1998. As a result of the divorce litigation, Plaintiff was deeded the Property by the Christian County Master Commissioner. This deed's description of the property refers to the "right of way of railroad." DN 58-6. The deed also excepts 1.6 acres of the property for a "County Road." *Id.*

## II. The United States' Acquisition of the Railroad

Tennessee Central conveyed its interest in the land along the railroad to Illinois Central Railroad by deed dated March 18, 1969. On June 30, 1980, the Illinois Gulf Central Railroad, the successor to the Illinois Central Railroad, applied to the Interstate Commerce Commission ("ICC") to abandon the use of the entire railroad line between Hopkinsville, Kentucky and Nashville, Tennessee. Over the objections of the Department of Defense, the ICC granted the petition to close the railroad on March 10, 1981.

The 101st Airborne Division of the United States Army requested a real estate planning report on May 4, 1981 regarding the proposed acquisition of the nineteen-mile stretch of railroad

---

[3] Emma Trubenbach acquired the property from Mark and Tamson Parker, who acquired the property from the United States in 1947.

between Fort Campbell and Hopkinsville, Kentucky.  The report, prepared by the Office of the Commander, United States Army Engineer District, stated that "discontinuation of rail services to Fort Campbell would have minimal impact on routine peacetime operations;" however, during national emergencies, continued rail service was considered essential for deploying active duty combat units to seaports and simultaneously mobilizing numerous reserve component units. Williamson Declaration, DN 52-5.  In addition, continued rail service was essential for the deployment of equipment.  *Id.*

The Department of Defense acquired its interest in the railroad by Special Warranty deed dated June 5, 1986.  George F. Williamson III, an attorney for the United States Army Corps of Engineers, prepared the deed.   Williamson, in his declaration, stated that "[i]t was always the intention of the United States to acquire a fee interest in this property."  DN 52-5.  Williamson further stated that, "Consistent with acquiring the property in fee, as part of this purchase the United States received a title insurance commitment from the Commonwealth Land Title Insurance Company that the Illinois Central Gulf Railroad Company, a Delaware corporation, held title to the land in fee simple."  *Id.*

**DISCUSSION**

**I.   The United States' Motion to Dismiss**

The United States moves this Court to dismiss Count IV of Fuqua's Third Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).  In Count IV, Fuqua asks this Court to declare that the United States' interest in the property along the railroad is an easement for railroad purposes, and not a fee interest, and therefore, the United States has no right to interfere with the use and enjoyment of the underlying property on which the easement is located.  The United States, in its motion to dismiss, contends that Fuqua failed

to bring this action within the appropriate period of time allowed by the Quiet Title Act, 28 U.S.C. § 2409a.

### a.   Standard for a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) provides that a party may file a motion asserting "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  "Subject matter jurisdiction is always a threshold determination," *Am. Telecom Co. v. Leb.*, 501 F.3d 534, 537 (6th Cir. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)), and "may be raised at any stage in the proceedings," *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008).  "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists."  *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).  "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading."  *Gentek Bldg. Prods., Inc. v. Steel Peel Litig.*, 491 F.3d 320, 330 (6th Cir. 2007).  Where there is a factual attack, the Court must "weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist."  *Id.*  "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3); *see also Bauer v. RBX Indus. Inc.*, 368 F.3d 569 (6th Cir. 2004).

"When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff."  *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)).  To

survive a Rule 12(b)(6) motion to dismiss, the complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). The "[f]actual allegations in the complaint must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted). A plaintiff must allege sufficient factual allegations to give the defendant fair notice concerning the nature of the claim and the grounds upon which it rests. *Id.* Furthermore, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A court is not bound to accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949.

### b. The United States' Waiver of Sovereign Immunity Pursuant to the Quiet Title Act

"It is elementary that 'the United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584 (1941)). The waiver of sovereign immunity "'must be unequivocally expressed.'" *Id.* (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). The Sixth Circuit has stated that "the language of any waiver of sovereign immunity is strictly construed in favor of the United States." *Reed v. Reno*, 146 F.3d 392, 398 (6th Cir. 1998).

Pursuant to the Quiet Title Act (the "Act"), the "United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a. "The Act provides the exclusive basis for jurisdiction over suits challenging whether the United States holds title to real

property." *Burlison v. United States*, 533 F.3d 419, 424 (6th Cir. 2008).  However, an action brought pursuant to the Quiet Title Act must be brought within twelve years from the date the plaintiff or her predecessor in interest knew or should have known of the claim of the United States.  28 U.S.C. § 2409a(g).  The Act's "statute of limitations acts a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses."  *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 737 (2001).

The Act's 12-year limitations period does not require the government to provide explicit notice of its claim, and the government's claim need not be clear and unambiguous.  *Id.* at 738. "'Knowledge of the claim's full contours is not required.  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.'"  *Id*. (quoting *State of N.D. ex rel. Bd. Of Univ. & Sch. Lands v. Block*, 789 F.2d 1308, 1313 (8th Cir. 1986)). Furthermore, the government's interest in the property "need not amount to full legal title . . . . As long as the interest claimed is a 'cloud on title,' or a reasonable claim with a substantial basis, it constitutes a 'claim' for purposes of triggering the twelve-year statute of limitations." *Richmond v. Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 769 (4th Cir. 1991).  Even if the government's claim is invalid, the limitations period begins to run when a landowner has reason to know that the government claims some type of adverse interest in the land.  *Spirit Lake Tribe*, 262 F.3d at 738.

Finally, "[b]ecause § 2409a limits the sovereign immunity of the United States, it must be interpreted according to federal law."  *Amoco Production*, 618 F.2d at 1387.  "However, federal courts may properly look to state law as an aid in determining the application of statutory language specific facts."  *Id*.  In particular, "[l]ocal practices and local rules are particularly indicative of whether a party should have known a relevant fact."  *Id*.  Additionally, "questions

involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state in where the realty is located." *Id*. However, "such state law should be compatible with the purpose of [the legislation so as] to find the rule that will best effectuate the federal policy." *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985) (alterations in original) (internal quotation marks omitted).

### c.  Analysis

The government contends that the Act's twelve-year statute of limitations began to run on July 1, 1986, the day the United States' deed from the Illinois Gulf Central Railroad was recorded in Christian County.  The government argues that, at this time, Plaintiff or her predecessor should have known that the United States claimed a fee interest in the railroad property.  In response, Plaintiff contends that the 1986 deed alone was not reasonable notice that the United States claimed a fee interest in the railroad property.  Instead, Plaintiff contends that the limitations period did not begin to run until either 2007 or 2009, when the issue of the government's ownership rights in the railroad property arose in *United States v. 20.67 Acres of Land*, Civil Action No. 5:07-cv-207.[4]

Constructive notice of recorded deeds may commence the running of the Act's twelve-year limitations period.  *See State of Cal. Ex rel. Stat Land Com'n v. Yuba Goldfields, Inc*., 752 F.2d 393, 396 (9th Cir. 1985); *Poverty Flats Land and Cattle Co. v. United States*, 706 F.2d 1078, 1079 (10th Cir. 1983); *Amoco Production Co. v. United States*, 619 F.2d 1383, 1387-88 n.3 (10th Cir. 1980).  The Court of Appeals for the Tenth Circuit has concluded that "as a matter

---

[4] Plaintiff, in her response to the government's motion to dismiss, contended that "It is not disputed that the first evidence of any notice of any adverse use with respect to the Plaintiff's property is found within the government's appraisal in the condemnation action," where the appraiser stated that "in an interview with Corps of Engineers, they stated that they will not allow expansion of the current crossing which they own in fee simple."

of federal law, . . . a party 'should have known' of a claim of the United States at the time he was clearly and properly imputed with constructive notice of that claim under local recording statutes." *Amoco Production*, 619 F.2d at 1388.  Because the situs of the land in question is in Kentucky, the Court may consult Kentucky law regarding actual or constructive notice.

Under the relevant Kentucky recording statute, a subsequent purchaser of real property for value is charged with notice of all deeds of record in his chain of title.  KRS § 382.080; *Blackburn v. Piney Oil & Gas Co.*, 128 S.W.2d 192, 195 (Ky. App. 1939).  "A purchaser of lands is chargeable, as a general rule, with notice of everything affecting the lands, which appear on the face of any deed, which forms a necessary link in the chain of title under which he holds, and further, with notice of every fact which he could have learned from inquiry, and which the things, recited in the deeds, made it his duty to inquire about."  *Charles v. Whitt*, 218 S.W. 994, 997 (Ky. App. 1920).  Even an ambiguous recorded deed provides a purchaser with constructive notice: where "the conveyance in the chain of title under which a purchaser for value claims shows on its face it is so ambiguous as to leave room for reasonable difference of opinion as to what was granted, or when the grant contains limiting or qualifying words sufficient to cast reasonable doubt on what was intended to be granted, the purchaser will be chargeable with notice of this ambiguity. . . ."  *Hudson & Collins v. McGuire*, 223 S.W. 1101, 1106-07 (Ky. App. 1920).

Here, the R.H. Rives and the E.H Garrott deeds conveying the railroad property to Tennessee Central were recorded in 1903.  Tennessee Central conveyed its interest in the land along its railroad to Illinois Central Railroad by deed dated March 18, 1969.  Mr. Ladd, Plaintiff's former husband, acquired the Property (which was comprised of the Rives and Garrott tracts) and recorded his deed on August 23, 1983.   DN 58-7.  The United States acquired its

interest in the railroad property from Illinois Gulf Central Railroad on June 5, 1986 and recorded its deed on July 1, 1986.  DN 58-4.  Thus, the deeds originally conveying the railroad property to Tennessee Central and subsequently to Illinois Central were in Mr. Ladd's chain of title; however, the deed conveying the railroad property to the United States was not in Mr. Ladd's chain of title.

The government has not provided any authority holding that, under these circumstances, Plaintiff or her predecessor in interest, Mr. Ladd, should have discovered the United States' recorded deed through the exercise of reasonable diligence.  *See Brown Hotel Co. v. Sizemore*, 197 S.W.2d 911, 912 (Ky. 1946).  Nevertheless, citing *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 179 (Ky. 2000), the government points out that "the principal reasons for recording deeds is to give notice to all the world and all interested parties of a transfer of interest in land."   Although this may be true, the government does not cite, and the Court cannot find, any authority in Kentucky or elsewhere "which holds that the mere recording of a deed is sufficient to place a landowner already possessed of good title through a duly recorded deed on notice of a claim to a portion of his land made by a deed lying outside his chain of title."  *See Cliffs Plantation Timber Farm, LLC v. United States*, 2008 WL 427261 at *6 (S.D. Miss. Feb. 13, 2008); *see also Watts v. United States*, 2002 WL 97056 at *6 (D. Neb. Jan. 23, 2002) (explaining that "[a] finding that any recording would amount to constructive notice would eliminate the test of reasonableness from the 'should have known' component of the statute.").  In *Cliffs Plantation Timber Farm*, the United States contended that the recordation of its warranty deed in 1991 was sufficient to put the plaintiff's predecessor in interest, who acquired title in 1979, on notice of its claim to the property at issue.  2008 WL 427261.  The district court astutely noted that "[w]ere a court to adopt the rule advocated by the United States, all landowners would be charged with a duty to

11

constantly monitor the land transaction records in the counties of their lands' situs to ensure that no person filed a deed claiming a portion of their properties.  Such a rule would transform the 'should have known' language of § 2409a(g) from a 'reasonable awareness' standard into an unreasonable and absolute 'duty to become aware' one."  *Id*. at *6 (internal citation omitted). Because the United States' deed was outside of Mr. Ladd's chain of title to the Property, he was not charged with constructive notice of the United States' fee claim to the railroad property under Kentucky law.

Nevertheless, the government cites *California ex rel. State Land Commission v. Yuba Goldfields, Inc.*, 752 F.2d 393 (9th Cir. 1985) in support of its position that Plaintiff or her predecessor in interest should have known of the United States' claim to the property by virtue of the deed recorded July 1, 1986.  In that case, deeds covering the properties at issue were recorded by the United States in the early 1900s.  California did not bring suit under the Quiet Title Act until 1978.  The Ninth Circuit affirmed the district court's dismissal of the action pursuant to the Act's 12-year statute of limitations, holding that California had *actual knowledge* of the government's claim in the 1900s because it was subjectively aware that the deeds were executed and recorded exclusively in the name of the United States.  *Id*. at 396.  The court expressly declined to consider whether the recorded deeds were sufficient to impart constructive knowledge of the government's claims on California.  *Id*.  Thus, *Yuba Goldfields* does not support the government's position.

The government also cites *Spirit Lake Tribe*, 262 F.3d 732 in support of its position.  In *Spirit Lake Tribe*, the United States acquired more than 62,000 acres of Devils Lake from the state of North Dakota by virtue of a quitclaim deed.  The United States recorded its deed in 1971. The land acquisition was widely reported by local media outlets.  Additionally, the plaintiff

apparently knew about the acquisition because a 1970 tribal resolution expressed concern about land ownership in light of "the coming Garrison Diversion Project." *Id*. at 738. The court noted that "[t]he project itself was the single most important, visible public works project in North Dakota in the last half of the 20th century. The Tribe could hardly have turned a blind eye to its major details." *Id*. The court went on to state that even if the Tribe did not actually know that the government acquired title to the lake in 1971, it should have known as much by virtue of the quitclaim deed. *Id*. at 738-39. Thus, "[t]he quitclaim deed, coupled with the evidence that the Tribe likely knew about the extent of the Garrison Diversion Project, convinces us that, in 1971, the Tribe 'knew or should have known' that the government claimed Devils Lake." *Id*. at 739 (internal citation omitted). Thus, the court in *Spirit Lake Tribe* did not base its holding solely upon constructive notice imparted by the quit claim deed.

Thus, the Court now must determine whether other facts exist which would have made Plainitff or her predecessor in interest reasonably aware of the government's claim to a fee interest in the railroad property prior to December 22, 1997.[5] Based upon the Court's review of

---

[5] The "claim" in this case is a fee interest in the railroad property, and not just an easement in the railroad property. In *Deakyne v. Department of Army*, 530 F. Supp. 1322 (D. Del. 1982), the plaintiff brought an action to quiet title to 2.25 acres of marshland located alongside a canal. In 1887, the Delaware legislature authorized condemnation of the land for use by the United States for construction of the canal. *Id*. at 1323. The original plans for the canal would have left the land submerged; however, the canal as built bypassed the land. *Id*. The plaintiff traced his interest in the land through a chain of conveyances back to the original condemnees. *Id*. In 1963, the plaintiff's mother, his predecessor in interest, began negotiations with the Corp of Engineers to obtain a release of claims from the United States with respect to the land. *Id*. Prior to 1975, the Corps represented that the United States held a perpetual easement in the land. *Id*. at 1326. In 1975, the plaintiff received a letter from the Corps stating that the Delaware legislation authorized condemnation of a fee, instead of an easement, and that the United States held a fee simple interest in the land. *Id*. The government claimed that the Act's 12-year statute of limitations had run because plaintiff's predecessor in interest knew at the time of condemnation that the government claimed some interest in the land. *Id*. at 1325-26. Rejecting that argument, the district court found that the Act's 12-year statute of limitations only began to run when the government first claimed a fee interest instead of an easement in the property. *Id*. at 1326. The

Plaintiff's depositions, it appears that Plaintiff and Mr. Ladd, at some point in time, were aware that the United States' claimed at least *some* interest in the railroad property.  In her deposition taken in *United States v. 20.67 Acres*, Plaintiff stated that she and Mr. Ladd purchased the Property for investment purposes.  DN 90 at p. 12.  This in turn raised the issue of access to the Property by crossing the railroad tracks:

Q.  Now, to access it, you have to go over the railroad tracks –

A.  Yes.

Q.  – over at Naomi Lane?  The railroad tracks are not owned by you, correct?

A.  No.  I think the Corps of Engineers owns that.

Q.  The Army owns that.  Did they give you permission to go over the railroad track?

A.  We have an easement through there, and I'm assuming we – the people that owned it before us went over there for years and years . . .  I've always assumed that was the access road.  The road was already there when we bought the property.

Q.  Naomi Lane?

A. Right.

. . .

Q.  Okay.  I guess my question is, from your perspective, then, how do you get over the railroad tracks?  Was there any discussion about that?

A.  Yes.  There was a lot of discussion and brainstorming . . .

Q.  Okay.  But did you ever talk about how you were going to get over the railroad tracks?

---

Third Circuit affirmed the district court's analysis on this point, but remanded for a determination of whether other facts warranted a finding that the plaintiff's predecessor in interest should have known that the Government claimed a fee interest in the land as early as 1924.  *Deakyne v. Dept. of the Army Corps. Of Engineers*, 701 F.2d 271, 274-75 (3d Cir. 1983), *cert. denied*, 104 S.Ct. 78 (1983).

A.   Yeah.   The plan was – and I didn't know if that would come to – fact that Robert was going to try to get that during his city council.   We also was – had joint AUSA, and we went to Washington several times on those trips and he had talked to different people, mayors in Hopkinsville and representatives about that road.   But it was always a vision . . .

       Mr. Thomas:  I don't think you all are talking about the same roads.

       Ms. Fuqua:  Oh, we're not?  Okay.

       Mr. Thomas: You're talking about Naomi Lane, correct?

       Mr. Schecter: I'm talking about the railroad track that –

       Ms. Fuqua: Well, you can get over the railroad tracks two different ways.

       Mr. Schecter: She's talking about a different road.

       Mr. Thomas: Just want to make sure you all are talking – because Naomi Lane – I've litigated Naomi Lane before, and that's a city street.   Of course, as you probably know under Kentucky law, that's been the access to this property for many, many, many years and it's considered a city street.
. . .

       Mr. Thomas:   Is there a claim that there is not a right to go over that railroad track?

       Mr. Schecter: Well –

       Mr. Thomas: I've never heard that in –

       Mrs. Fuqua: I've never heard that.

       Mr. Schecter: I get to ask the questions.

       Mr. Thomas: Well, I mean, is there?  If there is – in 20 years, I've never heard that claim.   Because if there is, I need to file a lawsuit against the United States of America to establish that.

       Mr. Schecter:  Okay.  The United States of America owns the railroad fee simple, correct?  That's your understanding?

       Mr. Thomas:  That's not my understanding.

Q. (By Mr. Schecter) Is that your understanding?

A.  Well, there's a lot of railroad tracks, but roads go over a lot of tracks.

      . . .

A.  I really had never thought of that as an issue.  I mean, we just always crossed it.  The road was there when we bought it.

Q.  I understand you always crossed it.  I'm talking about with the investment potential, the type of improvements and developments that need to be done, was there any discussion about how those improvements were going to be made given the fact that there's a railroad that needs to be crossed that's not owned by you?

A.  We talked about getting permits to bore a line under them for water and sewage.

Q.  From the United States?

A.  Yes.  We were trying to talk – first there was a lot of discussion at the city council meetings . . . And there was a lot of discussion about that.  Oak Grove at the time was a young city.  There was very few officials that worked there . . . And so it was brainstorming and not knowing how to get it done.

Q.  Was there ever any attempt to address that directly with the United States?

A.  I don't know of a time.  I don't know of one.

DN 90 at p. 12-15.   Thus, it is clear that Plaintiff and Mr. Ladd knew the United States had *some* interest in the railroad. However, the critical question before the Court is when Plaintiff or her predecessor, Mr. Ladd, should have known that the United States claimed a *fee* interest in the railroad property.

As discussed above, the R.H. Rives and E.H. Garrott deeds conveying the railroad property to Tennessee Central were in Ladd's chain of title.[6]  These deeds, utilizing identical language, convey "a strip of land one hundred feet wide, fifty feet on the right and fifty feet on the left of the center line of the survey of said railroad" to Tennessee Central, "its successors and assigns forever."  DN 58-2.  Importantly, these deeds do not use the term "right of way" or recite

---

[6] As noted above, the government disputes that the land conveyed by the Rives deed comprises a portion of the railroad property adjacent to Fuqua's Property.

16

the purpose of the conveyance to be for the operation of a railroad.  Likewise, the deeds conveying the railroad property to Illinois Central and subsequently to Illinois Central Gulf Railroad Company, which were also in Mr. Ladd's chain of title, do not use the term "right of way" with respect to the land previously conveyed by R.H. Rives and E.H. Garrott.  As discussed above, Mr. Ladd had constructive notice of these deeds when he purchased the Property.

Plaintiff argues that these deeds, specifically the 1903 deeds conveying the railroad property to Tennessee Central, conveyed an easement for railroad purposes and not a fee interest. Plaintiff cites *Illinois Central R.R. Co. v. Roberts*, 928 S.W.2d 822 (Ky. App. 1996) in support of her argument.  The dispute in that case was dependent upon whether Illinois Central owned a fee interest or an easement in the railroad.  Although the court only had two of the relevant deeds, those deeds conveyed a "strip of land" and referenced the strip as a "right of way."  *Id*. at 825. The court noted that such language evidenced both a conveyance in fee and the creation of a right-of-way easement.  *Id*.  The court then concluded that, where "land is purportedly conveyed to a railroad company for the laying of a rail line, the presence of language referring in some manner to a 'right of way' operates to convey a mere easement notwithstanding additional language evidencing the conveyance of a fee."  *Id*.  Here, in comparison, the deed conveying the property to Tennessee Central does not refer to the land to be conveyed as a "right of way" and does not state that the purpose of the conveyance was for a railroad.[7]

Fuqua also cites *Rose v. Bryant*, 251 S.W.2d 860 (Ky. 1952), as authority that "a deed executed pursuant to condemnation proceedings by a railroad conveys only an easement in the

---

[7] Fuqua, in her cross-motion for summary judgment, contends that the "survey" referenced in the deed is the recorded survey map of Tennessee Central.  This map uses the term "right of way." Fuqua contends that the map, and therefore the right of way language, was incorporated into the 1903 deeds.

property, and upon abandonment of the easement, the land reverts to the grantor or his successors in title." Here, the record shows that Tennessee Central did acquire the R.H. Rives and W.A. McKenzie tracts through condemnation proceedings. There is no such evidence that Tennessee Central acquired the Garrott tract by condemnation proceedings. Nevertheless, *Rose v. Bryant* does not stand for the proposition that a railroad company may never obtain land in fee for the construction of its railroad. It still remains that the deeds in question purport to convey a strip of land and do not contain right of way language.

Even if these deeds were ambiguous as to whether they purport to grant a fee interest or an easement in the railroad property, Mr. Ladd had constructive notice of the ambiguity. *See Hudson & Collins*, 223 S.W. at 1106-07 (where "the conveyance in the chain of title under which a purchaser for value claims shows on its face it is so ambiguous as to leave room for reasonable difference of opinion as to what was granted, or when the grant contains limiting or qualifying words sufficient to cast reasonable doubt on what was intended to be granted, the purchaser will be chargeable with notice of this ambiguity. . . ."). Thus, Plaintiff and her predecessor in interest should have known of the United States' claim to a fee interest when they learned the government acquired the railroad property. It was not necessary that the government provide explicit notice of its claim to a fee simple or that the government's claim be clear and unambiguous. *Spirit Lake Tribe*, 262 F.3d at 738. For purposes of the Quiet Title Act's limitations period, it is sufficient that the government had a reasonable claim to a fee interest in the railroad property with a substantial basis. *See Richmond*, 945 F.2d at 769.

If Plaintiff or Mr. Ladd, her predecessor in interest, learned of the government's acquisition of the railroad prior to December 22, 1997, then this Court would be without subject matter jurisdiction pursuant to the Quiet Title Act's 12-year statute of limitations. A review of

the record reveals little evidence as to the crucial issue of when Ladd and Fuqua learned of the government's interest in the railroad property.  However, a letter dated November 1, 1994 from the city attorney for Oak Grove to Robert Ladd and Robert Clark concerned the development of Naomi Lane "from U.S. Highway 41A East to the United States Government Railroad."  DN 77-1 at p. 43-44.  The letter additionally stated that "it appears [ ] that Naomi Lane is a 'public access road' from U.S. Highway 41A East to United States Government right-of-way."  *Id.* Accordingly, it appears that by November 1, 1994 at the latest, Mr. Ladd knew of the government's interest in the railroad property.

The Court must strictly construe the 12-year limitations period in favor of the United States.  *Vincent Murphy Chevrolet*, 766 F.2d at 452.  Because the prior deeds to the railroad property in Mr. Ladd's chain of title utilize fee language and do not use the phrase "right of way," Mr. Ladd should have known of the government's claim to a fee interest in the railroad property by November 1, 1994.  Further, the evidence in the record supports the conclusion that Mr. Ladd and Plaintiff knew of the government's claim in the 1990s, as Plaintiff stated in her deposition her belief that the United States owned the railroad property.  This action was filed December 21, 2009, more than fifteen years after Plaintiff's predecessor in interest should have known of the government's claim.  Accordingly, Count IV of Plaintiff's Third Amended Complaint is time-barred by 28 U.S.C. § 2409a(g).

Although this Court is without subject matter jurisdiction to hear Plaintiff's quiet title action, this does not mean that title to the railroad property is quieted in the United States.  As the Supreme Court has noted, "[a] dismissal pursuant to § 2409a[(g)] does not quiet title to the property in the United States.  The title dispute remains unresolved.  Noting prevents the claimant from continuing to assert his title, in hope of inducing the United States to file its own

19

quiet title suit, in which the matter would finally be put to rest on the merits." *Block*, 461 U.S. at 291-92.  As the Court is without jurisdiction to address the merits of Plaintiff's claim, the Court makes no judgment as to whether the United States owns the railroad property in fee or only has an easement in the property.

## II.  **Parties' Motions for Summary Judgment**

The United States moves this Court for judgment that (1) the United States is the owner in fee simple of the 100 foot wide strip of land abutting Plaintiff's Property on which its railroad operates, (2) the grade crossing over the railroad tracks and onto Plaintiff's Property is a private crossing, (3) the public road known as Naomi Lane does not cross over the railroad tracks, and (4) Plaintiff has no right to enlarge the current crossing to expand her rights of ingress and egress beyond its current conditions without the permission of the United States.  Plaintiff, in her cross-motion for summary judgment, moves this Court for a judgment that (1) she is the owner of the fee interest to the centerline of the railroad and (2) Naomi Lane is a public road and public crossing to the east side of the road and the United States has no legal right to restrict it.

### a.  **Summary Judgment Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.

*Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere

scintilla of evidence in support of his position; the plaintiff must present evidence on which the

trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for

summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly

supported motion for summary judgment.  A genuine dispute between the parties on an issue of

material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys.*

*Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

### b.  The United States' Ownership Interest in Railroad Property

Because the Court dismissed Count IV of Plaintiff's complaint as time-barred under 28

U.S.C. § 2409a(g), the government's and Plaintiff's motions for summary judgment are MOOT

as to this count.  Likewise, because the Court is without jurisdiction to determine whether the

United States owns the railroad property in fee or merely an easement in the property, the Court

is without jurisdiction to determine the extent of Fuqua's rights with respect to the railroad

crossing and the extent to which United States may restrict Fuqua's use of the railroad crossing

by virtue of their respective rights or interests in the property.

### c.  Naomi Lane and the Nature of the Railroad Crossing

Naomi Lane runs perpendicular to the United States' railroad, intersects the railroad and

connects Plaintiff's Property to U.S. Highway 41A.  It is undisputed that a portion of Naomi

Lane is a public road, formally dedicated and accepted by Christian County and subsequently by

Oak Grove.  Plaintiff asks this Court to declare that Naomi Lane is a public road that crosses

over to the east side of the railroad, and that the railroad crossing is therefore public.  Plaintiff

contends either that: (1) the portion of Naomi Lane formally dedicated and accepted extends to

the east of the railroad tracks; (2) that Naomi Lane in its entirety is a county road which could not be abandoned without formal action on the part of the county; or that (3) Naomi Lane to the east of the railroad is a "public road" which has not been abandoned by non-use. In response, the government contends that the public portion of Naomi Lane ends on the west side of the railroad, and that the railroad crossing is therefore private.

1.  Facts Relating to Naomi Lane

Plaintiff's expert, Keith Biggerstaff, states that Naomi Lane/Road was first noted as an existing road in the 1914 deed conveying the E.H. Garrott tract to W.A. McKenzie. DN 76-4 at p. 2; DN 70-3. Since that time, Naomi Lane has been referred to in several deeds to the various tracts of property in proximity to the road. Naomi Lane to the west of the railroad was referred to in one such deed as a "county road." The 1983 deed conveying the Property from Martha Stump to Robert Ladd expressly excludes "County Road approximately 1.6 acres. This property is subject to all easements and rights of way of record." DN 75-12. A map prepared by surveyor Charles Billingsley in connection to that deed depicts Naomi Lane as "old county road," crossing over the railroad to the east and continuing until the intersection with Interstate 24. DN 75-12 at p. 3. Likewise, the deed conveying the Property from Mr. Ladd to Plaintiff expressly excludes 1.6 acres for the road.

Besides reference to the road in several deeds, Naomi Lane is also depicted in other public records. The 1936 Kentucky State Highway plans for what is now U.S. 41A depicts Naomi Lane as crossing the railroad tracks and continuing eastward to connect with another road. DN 76-6; DN 75-5. Additionally, a recorded March 25, 1938 United States Department of Agriculture survey depicts a lane (labeled only "Lane") extending across the railroad and continuing to a point well east of the current Interstate 24. DN 75-13. This survey states that,

22

"all areas within road rights-of-way are subject to use for highway purposes and for ingress and egress of abutting property owners." DN 75-13 at p. 4. Mr. Biggerstaff states that Naomi Lane connected U.S. Highway 41A to Frank Wade County Road prior to the construction of Interstate 24.[8] A 1972 PVA map shows a "gap" for Naomi Lane, indicating that no tax was assessed for the road. Vaughan Deposition at p. 91-92.

However, there are also several maps on which Naomi Lane does not appear. Specifically, Naomi Lane does not appear on the 1937 and 1955 Christian County Road Series Maps. Naomi Lane does appear on a 1991 map of Christian County and is shown to extend slightly over the railroad. The government's expert, Scott Vaughan, opines that the depiction is "not in accordance with state highway plans of record. The scale (length) of the roadway appears to have been exaggerated by the map's author as if it had been shown to plan length, it would have been imperceptible on the published map." DN 58-20 at p. 1. This 1991 map was approved by the Christian County Fiscal Court on March 26, 1991.

Although depicted in some maps as extending over the railroad and connecting to another road, it appears that Naomi Lane in its entirety was never incorporated into a state, county, or municipal road system. Prior to 1989, Naomi Lane was a part of the state's primary road system as KY 6066. In 1989, Naomi Lane was dedicated and accepted by Christian County when the Commonwealth of Kentucky eliminated Naomi Lane from the state primary road system through Kentucky Transportation Cabinet Official Order No. 92211. That Order describes KY 6066 as "Naomi Lane, from the junction with US 41A, 0.46 mile south of the I-24 Interchange, extending northeast to a point that is 1011 feet from the beginning, a distance of 0.191 mile." DN 58-19 at p. 4. Although KY 6066 is described as only 1011 feet in length, a relocation of Naomi Lane

---

[8] According to Plaintiff, after construction of the Interstate, Naomi Lane was cut in half leaving Plaintiff's property as the only tract served by Naomi Lane to the east of the railroad crossing.

resulted in the addition over 1600 feet in length to the road.[9]  On May 2, 2000, Naomi Lane was dedicated and accepted by the City of Oak Grove by City Ordinance No. 2000-06.  DN 58-17. The map incorporated by reference into the Ordinance depicts Naomi Lane, "Approx 2683 linear feet," as ending at the railroad. Although at least Naomi Lane to the west of the railroad was accepted by Oak Grove, there is no evidence that Oak Grove has expended any funds to maintain Naomi Lane to either the west or to the east of the railroad.

The termination point of Naomi Lane, as accepted by Oak Grove, is disputed by the parties.  Currently, the Kentucky Department of Transportation Cabinet's ("KYDOTC") Highway Information System ("HIS") shows Naomi Lane as a city street, beginning at U.S. 41A and ending at a point west of the railroad tracks, .489 miles in length.  The HIS also shows a private roadway adjacent to Naomi Lane, beginning at the railroad tracks on the west side and crossing over the tracts to the east, a total of .232 miles in length.  There is also .022 miles of private roadway that crosses directly over the railroad tracks.  DN 85-10.  However, Plaintiff contends that, until Fall 2011, KYDOTC records available to the public continuously showed Naomi Lane as .511 mile in length and ending to the east of the railroad.  DN 88 at p. 5.

Pat Lee, the Geographic Information Systems ("GIS") Manager for the Pennyrile Area Development District ("PADD"), states that Naomi Lane, as accepted by Oak Grove, does not extend over the railroad tracks.  Previously, Ms. Lee stated in a December 7, 2011 affidavit that 2002 GPS data collected as part of the Road Centerline Data Collection Project reflected that "Naomi Lane is an Oak Grove City Street and extends 61.99 feet to the east from the centerline of the railway."  DN 78-1 at ¶ 4-5.  However, Ms. Lee later stated that the December 7, 2011

---

[9] The government states that the relocation of Naomi Road occurred subsequent to the dedication and acceptance of Naomi Lane by Christian County in 1989.  DN 58-1 at p. 22-23.  Fuqua states that the relocation of Naomi Lane occurred in the 1970s due to construction of Interstate 24.  DN 67-1 at p. 9-10.

affidavit utilized information that was not current.  DN 85-11 at ¶ 4.  Now, Ms. Lee states that

Naomi Lane is an Oak Grove City Street that stops on the west side of the railroad tracks.  Ms.

Lee states that, at that point, a private road begins and crosses over the railroad tracks.  *Id.* at ¶ 5.

Plaintiff contends that, after Mr. Vaughan's deposition, a KYDOTC member contacted Ms. Lee

and requested that she look into the stopping point of Naomi Lane.  Ms. Lee then emailed Bill

Chaudoian, who provided her with the following information: "please find attached a copy of the

ordinance adopting Naomi Lane as a city street.  The public-of-way stops at the west r/w of the

U.S. DOD Rail Road."  Pat Lee Deposition at p. 35-36.  Thus, Plaintiff argues that the "changed

records are based on nothing more than Bill Chaudoian's interpretation of the 2000 Oak Grove

Ordinance accepting Naomi Lane as a city street."  DN 88 at p. 5.

### 2.  The Applicable Law

Historically, there were several methods of establishing a public or a county road.  *Porter*

*v. Johnson County Judge/Executive*, 357 S.W.3d 500, 503 (Ky. App. 2010).  First, the county

could make a formal decree that the road would be a county road.  *Id.*  Second, a property owner

could seek a declaration of a county road, thereby giving up the road in exchange for county

maintenance.  *Id.*  And third, the public could adversely utilize the road for a number of years,

thereby establishing a public road.  *Id.*  Utilizing these methods, Kentucky developed a system of

public roads and county roads, which were merely public roads maintained by a county.  *Id.*

After the enactment of the Road Act of 1914, county roads were required to be accepted

into the county road system by a formal decree.  *Id.*  This Act was the basis for KRS Chapter

178, which governs roads.  *Id.*  Currently, "county roads" are defined as "public roads which

have been formally accepted by the fiscal court of the county as a part of the county road system

. . . ."  KRS § 178.010(1)(b).  Without a formal order accepting the road, "though a road may be

'public,' it is not necessarily a 'county road.'" *Sarver v. Allen County, Ky*., 582 S.W.2d 40, 41 (Ky. 1979). The reason for this distinction is a public policy against holding counties responsible for the upkeep of all roads that may become "public" through the processes of dedication or prescription. *Id*. Any county road "lawfully established and opened and not lawfully discontinued or vacated shall continue as such, until properly discontinued." KRS § 178.020.

With respect to railroad crossings specifically, Kentucky courts have held that, "'for a [railroad] crossing to be a public one the road or street on which it is situated must be a public road or street established either in the manner prescribed by statute or by dedication, and if in the latter manner there must be an acceptance.'" *Calhoun v. CSX Transportation, Inc*., 331 S.W.3d 236 (Ky. 2011) (quoting *Deitz' Adm'x v. Cincinnati N.O. & T.P. Ry. Co*., 176 S.W.2d 699, 701 (1943)). "[T]he only way that a public highway may be established is in the manner provided by statute, or by its dedication to the public use and its acceptance by the proper authorities as a public highway." *Id*. (internal quotations omitted). "[A]lthough the acceptance need not be formal, some *control* on the part of the county authorities must be exercised." *Id*. (internal quotations omitted) (emphasis in original).

However, Kentucky courts have also held that actual acceptance is only required where there is an effort to hold the city responsible for maintenance of the road or where a duty is imposed by law relating to the particular road.[10] *Tolliver v. Louisville & N. R. Co*., 10 S.W.2d 623 (Ky. App. 1928). In *Tolliver*, the plaintiff sought to prevent the defendant railroad company

---

[10] The Court acknowledges that another Kentucky Court of Appeals decision, *Cole v. Gilvin*, 59 S.W.3d 468 (Ky. App. 2001), states that a roadway, dedicated and accepted by the public, may become a public road upon general public use and control and maintenance by the government for 15 years. However, as discussed below, the Kentucky Supreme Court stated in 2011 that a road may be a "public road" even if not maintained by the county or city.

from placing iron stakes along a street, rendering it impossible for drivers to cross the railroad at that point.  10 S.W.2d at 624.  The *Tolliver* court rejected the idea that actual acceptance by the city was required in that case.  "It has never been disputed in this state that a road may be so used by the public as to give the public a right to use it, whether the doctrine be founded upon presumptive dedication and acceptance or adverse possession.  When the public acquires such a right to use a road, a private individual may not obstruct the public use thereof."  *Id*. at 625.  "When the public thus obtains the right to use a road it has an easement which cannot be destroyed by the act of a private individual."  *Id*.  The court therefore concluded that, "if it can be established by evidence that the owners of the property dedicated this particular way to the public generally and the public accepted the dedication by a continued use of the street as a matter of right, the town did not have to accept the dedication before the public have any rights thereunder."  *Id*.

The law regarding dedication of a road for public use as set forth in *Tolliver* was recently affirmed by the Kentucky Supreme Court in *Nash v. Campbell County Fiscal Court*, 345 S.W.3d 811 (Ky. 2011), reh'g denied (Aug. 25, 2011).  The issue in that case was whether the road at issue was a "street."  There, the court explained:

> Open to the public means an intention by the owner that the way be used presently or in the future for such a public purpose.  If an owner can legally put a gate or barrier, like a chain, across a vehicular entrance to his property, the vehicular way is not open to the public in the sense that the owner of the fee can regulate the public use.  When the owner intends to subject his rights in the property to the public use, it is open to the public and we call that a dedication. Dedication, or open to the public, may be accomplished in a number of ways. Where the vehicular way is being established by a state, county, or local government, there may be a *voluntary conveyance* by deed of an easement or of a fee of the underlying right of way, or there may be an *involuntary taking* through eminent domain, neither of which is involved in the case herein.
>
> Dedication may also be made by private land owners. Most of the public streets and alleys in [existing] cities have been created by dedication in the platting and

development of various city subdivisions.   Such dedications may result from compliance with a statutory or regulatory scheme, like subdivision regulations, which contain street specifications, dedications, and in some cases, acceptance of maintenance by the local government.   A private land owner may also be *presumed* to have made a dedication of land for a public way.  This is creating a public highway by prescription. The theory behind a dedication by prescription holds that the long continued use of a highway by the general public rests upon a presumption of a lost grant, arising from the continuous adverse use of land (with the same elements of adverse possession).   Similar to a right of way by prescription that presumes dedication by a private land owner (after a passage of time) is a dedication by estoppel which does not have set time limits, but is based on promises and reliance thereon.

*Id*. at 818-19 (internal quotations and citations omitted).  The *Nash* court went on to note that "[i]t is not necessary that the road was 'accepted' for maintenance . . . . Most 'county roads' were 'public roads' before they were accepted for maintenance as county roads."  *Id*. at 819.  Public roads, in contrast to county roads, are subject to abandonment without formal action.  *Watson v. Crittendon County Fiscal Court*, 771 S.W.2d 47, 48-49 (Ky. App. 1989).

Here, Plaintiff does not seek to hold the City of Oak Grove responsible for the maintenance of Naomi Lane and does not seek to hold the United States responsible for the affirmative duties imposed on railroad owners by virtue of KRS § 277.010, *et seq*.  Instead, Plaintiff seeks only a declaration that the government may not restrict the public's use of Naomi Lane at the railroad crossing.  Thus, Plaintiff must be able to show that Naomi Lane, at and to the east of the railroad, is at least one of the following: (1) a county road; (2) a road that has been dedicated and accepted by the proper authorities; or (3) a public road that has not been abandoned.

### 3.   Whether Naomi Road to the East of the Railroad is a County Road

Plaintiff contends that Naomi Road, extending over and to the east of the railroad, is a county road.  The government contends that the eastern portion Naomi Road is not a county road, but if it was a county road at one time, that it has been informally abandoned pursuant to

KRS § 178.116.[11]   After reviewing the voluminous exhibits submitted in support of the parties'

motions for summary judgment, the Court finds that there is no genuine issue of material fact as

to whether Naomi Road is a county road.  The parties have not presented a formal order from the

Christian County fiscal court formally accepting Naomi Lane as a county road subsequent to

1914, if such an order exists at all.  Additionally, Fuqua has not presented sufficient evidence

that Naomi Lane was informally accepted by Christian County prior to 1914.[12]  The Court

acknowledges that Naomi Lane was depicted on several maps as extending over the railroad

tracks and that Naomi Lane, or at least a portion of it, was referred to as a county road or an "old

county road" in various deeds and by various surveyors; however, this evidence is not sufficient

for a trier of fact to reasonably conclude that Christian County actually accepted Naomi Lane to

the east of the railroad tracks as a county road in the manner prescribed by Kentucky law.

Because the Court has determined that Plaintiff cannot show that the eastern portion of Naomi

---

[11] KRS § 178.116 states as follows:

> Any county road, or road formerly maintained by the county or state, shall be
> deemed discontinued and possession shall revert to the owner or owners of the
> tract of land to which it originally belonged unless at least one (1) of the
> following conditions arise:
>
> (a)  A public need is served by the road;
> (b)  The road provides a necessary access for a private person;
> (c)  The road has been maintained and policed by the county or state within a
> three (3) year period.

KRS § 178.116(1).  The statute defines "necessary access" as "includ[ing] access to any farm,
tract of land, or dwelling, or to any portions of such farm, tract of land, or dwelling."  KRS §
178.116(5).  If none of the above three circumstances is present, and the county road was not
discontinued pursuant to KRS § 178.070, then the road automatically reverts back to the original
owners of the land or their predecessors.  *Bailey v. Preserve Rural Roads of Madison County,
Inc.*, -- S.W.3d --, 2011 WL 6542996 at *7 (Ky. Dec. 22, 2011).  In such a situation, no formal
action is required because the statute operates by law and not by fiscal court action.

[12] Prior to 1914, an "acceptance" by the county could be accomplished informally, *e.g.*, by
maintenance of county roads.  *See Riley v. Buchanan*, 76 S.W. 527, 528 (1903).

Lane was a county road, it need not address the government's argument that it was informally abandoned pursuant to KRS § 178.116.

 4. Whether Naomi Lane to the East of the Railroad has been Dedicated and Accepted

 Mr. Vaughan, the United States' expert, opines that "Naomi Lane is a city street, dedicated to public use, accepted as such by the City of Oak Grove, Kentucky, in 2000 having a termination point at the west right-of-way of the United States of America railroad by ordinance. The portion of Naomi lane that has been dedicated to public use and incorporated into the road system of the municipality of Oak Grove, Kentucky, does not extend past the west right-of-way line of the United States of America railroad." DN 58-20 at p.1. Mr. Vaughan further opines that roadways to the east of this termination point "(1) have not been formally dedicated to public use; (2) have not been incorporated into the state primary road system of the state of Kentucky nor the highway or road system of Christian County or the City of Oak Grove, Kentucky; and (3) are clearly private drives." *Id.* at p. 2.

 The Court finds that there is a genuine issue of material fact as to the exact termination point of Naomi Lane, as accepted by Christian County and subsequently by Oak Grove. First, that Oak Grove does not maintain Naomi Lane to the east of the railroad is not persuasive evidence that Naomi Lane is not a public road, as there is likewise no evidence that Oak Grove has maintained Naomi Lane to the west of the railroad. Second, besides "consult[ation] with both the Pennyrile Area Development District and the City of Oak Grove," the Court is unclear as to the basis for the KYDOTC's recent change of Naomi Lane from .511 miles in length to .489 miles in length, a change of more than 102 feet. This change is not in conformity with the Oak Grove ordinance accepting Naomi Lane, which lists the length of the accepted road as 2683 feet in length, or 0.508 miles. DN 58-17. The government has provided no explanation for this

30

discrepancy.  Third, the depiction of Naomi Lane as accepted by Oak Grove is of poor quality and is unclear as to whether the accepted road ends at the west right of way, at the centerline of the railroad, or at a point slightly east of the centerline.  Finally, the 1991 Christian County Road Series Map, approved by the Christian County Fiscal Court, shows Naomi Lane as extending slightly beyond the railroad.  Besides the KYDOTC Order No. 92211 describing KY 6066 as 1011 feet, which was no longer correct after the relocation of Naomi Lane, the Court has been presented with no other information regarding the description of Naomi Lane as actually accepted by Christian County.  The Court was unable to find any other depiction of KY 6066 or Naomi Lane as accepted by Christian County.  Although Mr. Vaughan has offered his own explanation for the 1991 map depiction, the Court finds that this 1991 map, along with the other factors listed above, precludes the Court from finding that no trier of fact could reasonably conclude that the road formally accepted by Christian County and subsequently by Oak Grove extended to, or to the east of, the railroad.

5.  <u>Whether Naomi Lane to the East of the Railroad is a Public Road</u>

Plaintiff further contends that Naomi Lane at and to the east of the railroad crossing is a public road.  Although the Court has previously found that actual acceptance for maintenance is not requirement for the establishment of a public road, the government maintains that Naomi Lane to the east of the railroad is not a public road because there is no evidence that the state, Christian County, or Oak Grove ever accepted Naomi Lane for maintenance.  The government further contends that, if Naomi Lane to the east of the railroad were once a public road, it has since been abandoned by non-use.  Although there is significant evidence (discussed above) that Naomi Lane was once a public road which extended over the United States' railroad and through Plaintiff's Property to connect to another road, the Court finds that there is not a genuine issue of

31

material fact as to whether the eastern portion of Naomi Lane is currently a public road because it is clear that such road has not been utilized by the public for an extended period of time.

"A public road that is not a 'county road' can be abandoned without formal action.  When the public has acquired the free use of a roadway by a user . . . it may abandon that right by a long period of nonuser."  *Sarver v. County of Allen*, 582 S.W.2d 40, 41 (Ky. 1979) (citations omitted).  Since the construction of Interstate 24, Plaintiff's Property is the only property capable of being served by Naomi Lane.  Like in *Sarver*, the only possible use of Naomi Lane to the east of the railroad is for the private convenience of Plaintiff, or the owner of the Property.  *See id*. at 43.  As evidence that Naomi Lane to the east of the railroad is actually used by the public, Plaintiff testified that a number of cars would cross the railroad and turn around in her property. B.J. Dennis, who performed railroad maintenance at the crossing, also testified that cars would cross the railroad and turn around.  DN 71-4 at p. 15.  Mr. Dennis also testified that he observed a phone or gas company use Naomi Lane to get to a fenced-in area.  *Id*.   However, this is insufficient to establish general public use. "The sporadic use of a passway by a few neighbors or members of the general public does not turn it into a public road."  *Cole v. Gilvin*, 59 S.W.3d 468, 474 (Ky. App. 2001).   Thus, the non-use of Naomi Lane to the east of the United States' railroad since the construction of Interstate 24 over forty years ago constitutes an abandonment of the status of public road.  *See Sarver*, 582 S.W.2d at 43 (finding that non-use of a public road for over 15 years constitutes an abandonment).

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED:

1. Defendant's motion to dismiss (DN 84) is GRANTED and Count IV of Plaintiff's complaint is DISMISSED.

2. Plaintiff's motion for summary judgment (DN 67) is MOOT in part and DENIED in part. Because Count IV of Plaintiff's complaint was dismissed for lack of subject matter jurisdiction, Plaintiff's motion for summary judgment as to this Count is MOOT. Plaintiff's motion as to Count V of her complaint is DENIED.

3. Defendant's motion for summary judgment (DN 58) is MOOT in part and DENIED in part.  Because Count IV of Plaintiff's complaint was dismissed for lack of subject matter jurisdiction, Defendant's motion for summary judgment as to this Count is MOOT.  As to Count V of Plaintiff's complaint, a genuine issue of material fact exists as to whether Naomi Lane at the United States' railroad is a public highway by the process of dedication and acceptance.  Accordingly, Defendant's motion for summary judgment is DENIED as to Count V.